UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO: 4:04CV-173-M

| | |
|---|---|
| MICHELLE L. SMITH | PLAINTIFF |
| AND | |
| WARD NORTH AMERICA | |
| AND | |
| CENTURY TEMPORARY SERVICES<br>d/b/a RANSTAD NORTH AMERICAN | INTERVENING PLAINTIFFS |
| VS. | |
| WAL-MART STORES EAST, L.P. | DEFENDANT |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon a motion by the Defendant, Wal-Mart Stores East, L.P., for summary judgment [DN 8]. The Court has reviewed the parties' filings and the record herein and for the reasons set forth below, the Defendant's motion is **DENIED**.

### I. FACTS

On July 8, 2003, the Plaintiff, Michelle L. Smith, was employed by a temporary employment agency, Intervening Plaintiff Century Temporary Services, d/b/a/ Ranstad North America ("Ranstad"). Ranstad placed Smith at the Bluegrass Cellular kiosk located inside the Wal-Mart store in Leitchfield, Kentucky. Smith was employed as a sales associate and her duties included selling contracts for cellular telephone service plans, cellular telephones, as well as accessaries, telephone plates, covers, batteries, chargers, and earphones. She also

interviewed customers, performed credit checks, and kept the kiosk clean. Plaintiff alleges that she was injured when a ceiling tile fell on her head while she was working in the kiosk. On July 7, 2004, Plaintiff filed suit against Wal-Mart in Grayson Circuit Court alleging that she suffered injuries as a result of Wal-Mart's failure to maintain its store and provide a reasonably safe premises.

*License Agreement*

Bluegrass Cellular operated the kiosk in the Wal-Mart store pursuant to a License Agreement with Wal-Mart Stores, Inc., dated March 1, 2002. For a monthly fee of $2,200.00, Bluegrass acquired the use of twenty-four square feet of floor space inside the store for the purpose of selling cellular phones, cellular plans, and accessories. (License Agreement at §6.01). Under the provisions of the License Agreement, the exact location of the kiosk was determined by Wal-Mart. (Id. at §3.02). Wal-Mart was required to furnish, at its expense, all power, water, heat and air condition, as well as pay the cost of relocation of the kiosk within the store, if done at Wal-Mart's request. (Id. at §7.01).

Pursuant to the License Agreement, Bluegrass Cellular was to operate the kiosks "with its own independent inventory, cash handling procedures and employees." (Id. at §3.03). Further, the Agreement provided that Bluegrass Cellular "shall maintain the Kiosks at all Kiosk Stores, at [Bluegrass Cellular's] cost and expense, in good working order." (Id. at §8.01). Under the terms of the Agreement, Bluegrass Cellular agreed to operate the kiosk seven days a week from 10:00 a.m. to 8:00 p.m. (Id.). If this requirement was not fulfilled, Wal-Mart gave Bluegrass Cellular twenty-four hours to cure the default. (Id. at §10.08). If

the default occurred again, Wal-Mart had the right to remove the kiosk from the store and receive all rent due as well as an amount equal to two months of rent. (Id.). Wal-Mart retained the ability to enter the kiosk at any time in order to examine the kiosk, to observe the manner in which Bluegrass Cellular conducted business, or to make any reasonably necessary improvements, repairs, or alterations to the premises. (Id. at §5.03).

The License Agreement prohibited Bluegrass Cellular from operating its business in Wal-Mart's name or even referencing the name of Wal-Mart without Wal-Mart's written permission. The License Agreement provided that "each shall have no right or interest in or to the other party's trademarks, tradenames, servicemarks, or other intellectual property rights." (Id. at §9.02). The License Agreement expressly stated that the Agreement did not vest in Wal-Mart any control over the Bluegrass Cellular facility or its operations and that "[e]ach party is an independent contractor and shall not hold itself out as an agent or employee of the other party." (Id. at §9.03). Further, the agreement specifically denied Bluegrass Cellular employees, personnel, and customers "access to lounges, break areas or restroom facilities designated specifically for use by Wal-Mart associates." (Id. at §3.02).

Furthermore, while Bluegrass Cellular was required to submit monthly phone sales reports to Wal-Mart's program coordinator (Id. at § 8.03), Wal-Mart did not receive any percentage of Bluegrass' Cellular's sales. The only money Wal-Mart received from Bluegrass Cellular was the fixed monthly rent. Both parties were given remedies in the event of a breach of contract. (Id at §§ 10.01-10.05).

*Wal-Mart Connection Centers*

Wal-Mart began installing Connection Centers in the electronics department of select Wal-Mart stores in 2001 and staffing the Centers with Wal-Mart employees. The employees in the Connection Centers performed similar tasks as Bluegrass Cellular employees, namely interviewing customers, performing credit checks, and selling cellular telephones, agreements, and accessories. The License Agreement between Bluegrass Cellular and Wal-Mart gave Wal-Mart the option of terminating the Agreement in question and replacing the kiosk with a Connection Center. Additionally, the Agreement gave Wal-Mart the option of either installing a Connection Center in new or relocated stores or entering into an agreement with Bluegrass Cellular for a kiosk in those stores. (Id. at § 10.09). In 2003, Wal-Mart opened a new store in Leitchfield with a Connection Center and therefore did not enter into an agreement with Bluegrass Cellular for that store.

*Workers' Compensation*

Intervening Plaintiff Ranstad was the Plaintiff's employer at the time of her injury. Ranstad was insured for purposes of workers' compensation by Ward North America, Inc. Plaintiff received workers' compensation benefits pursuant to the Kentucky Workers' Compensation Act. Ranstad and Ward North America have intervened in this action to recover the workers' compensation paid and payable to Smith.

## II. STANDARD OF REVIEW

In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories, and affidavits, establish that there

is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Co., 475 U.S. 574, 586 (1986). Rule 56 requires the non-moving party to present "*specific facts* showing there is a *genuine* issue for trial." Fed. R. Civ. P. 56(e) (emphasis added). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. It is against this standard that the Court reviews the motion for summary judgment.

### III. DISCUSSION

Wal-Mart asserts that the Plaintiff's complaint against it is barred by the exclusive remedy of workers' compensation. KRS 342.690(1) provides that if an employer secures payment of workers' compensation under Chapter 342, "the liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer . . . . For

5

purposes of this section, the term 'employer' shall include a 'contractor' covered by subsection (2) of KRS 342.610, whether or not the subcontractor has in fact, secured the payment of compensation." See Granus v. North American Philips Lighting Corp., 821 F.2d 1253 (6th Cir. 1987).

> KRS 342.610(2) provides in part as follows:
>
> A contractor who subcontracts all or any part of a contract and his carrier shall be liable for the payment of compensation to the employees of the subcontractor unless the subcontractor primarily liable for the payment of such compensation has secured the payment of compensation as provided for in this chapter. . . . A person who contracts with another:
> (a) To have work performed consisting of the removal, excavation, or drilling of soil, rock, or mineral, or the cutting or removal of timber from land; or
> (b) To have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession of such person
> shall for the purposes of this section be deemed a contractor, and such other person a subcontractor. . . .

KRS 342.610(2).

"The purpose of the provision of KRS 342.610 that a contractor is liable for compensation benefits to an employee [of] a subcontractor who does secure compensation benefits is to prevent subcontracting to irresponsible people." Fireman's Fund Ins. Co. v. Sherman & Fletcher, 705 S.W.2d 459, 461 (Ky. 1986). By the same token, "if a defendant qualifies as a contractor, 'it has no liability in tort to an injured employee of a subcontractor' once worker's compensation benefits are secured." Giles v. Ford Motor Co., 126 Fed. Appx. 293, 295 (6th Cir. April 4, 2005)(quoting Fireman's Fund, 705 S.W.2d at 461). Essentially, "the Act treats the employees of a subcontractor as *de jure* employees of the contractor for

the purposes of guaranteeing worker's compensation benefits." Giles, 126 Fed. Appx. at 295.

Wal-Mart maintains that it is immune from tort liability under KRS 342.690 because it is a contractor as defined by KRS 342.610(2)(b), and because its subcontractor – Bluegrass Cellular – secured workers' compensation benefits for Smith. Wal-Mart argues that it meets the definition of "contractor" under KRS 342.610(2)(b) since it was " . . . a person who contracts with another . . . (b) to have work performed of a kind [i.e. the sale of cellular telephones and cellular telephone agreements] which is a regular and recurrent part of the work of the trade, business, occupation, or profession of such person." Wal-Mart argues that it operates retail department stores throughout the United States that provide many different goods and services to Wal-Mart customers, including food (groceries), portraits (photography studios), hair cuts (hair salons), prescriptions (pharmacies), glasses and eye examinations (vision centers), and cellular telephones with service agreements. The record reflects that in some Wal-Mart stores with Connection Centers, Wal-Mart uses its own employees to sell cellular telephone. In other stores, Wal-Mart "leases space to a contractor to provide the service to customers." (Defendant's Motion for Summary Judgment at 10). Wal-Mart argues that when Smith was injured, she was performing the exact same duties as Wal-Mart employees; and therefore, Wal-Mart is a contractor under KRS 342.610(2)(b) as interpreted by Fireman's Fund.

In Fireman's Fund Insurance Co. v. Sherman & Fletcher, 705 S.W.2d 459 (Ky. 1986), Sherman & Fletcher were the owners and developers of a residential construction complex.

Elder, Inc., was a framing subcontractor who had contracted to perform the rough framing carpentry work on the project. The plaintiff, an employee of the subcontractor, was killed when a concrete block wall at the construction site collapsed. The insurance carrier of Elder paid workers' compensation benefits to the estate of the plaintiff. The estate of the plaintiff sued Sherman & Fletcher seeking damages for plaintiff's wrongful death on the grounds that Sherman & Fletcher failed to properly supervise the construction of the project and failed to require that the concrete block wall under construction be adequately braced. Id. at 460. The question before the Court was whether at the time of the injury, Sherman & Fletcher qualified as a contractor under KRS 342.610(2)(b). The Kentucky Supreme Court held that Elder had agreed to perform the rough framing carpentry work on the project and that it could not "be disputed that rough framing carpentry is work of a kind which is a regular or recurrent part of the work of the occupation or trade of building construction in which Sherman & Fletcher was engaged." Id. at 461. The Kentucky Supreme Court held that Sherman & Fletcher was a contractor as defined by KRS 342.610(2)(b) and pursuant to KRS 342.690, the injured employee's exclusive remedy was under the Workers' Compensation Act.

  The courts in both Kentucky and the Sixth Circuit have routinely applied Fireman's Fund and its progeny to cases in which a subcontractor's employee was injured while performing construction work or routine maintenance and repair work for a contractor. See also Daniels v. Louisville Gas and Electric Co., 933 S.W.2d 821 (Ky. App. 1996)(finding that EPA emissions tests performed nine times per year were a regular part of LG & E's

business); Rehm v. Navistar Intern, ___ S.W.3d ___, 2005 WL 458713 (Ky. App. Feb. 25, 2005)(finding that removal, replacement, and installation of pump at coal processing plant was regular and recurrent part of business); Hosack v. Grayson Rural Electric Co-op, 2004 WL 2482609 (Ky. App. Nov. 5, 2004)(maintenance of power line of electric company is regular and recurrent part of work of electric company); Granus v. North American Philips Lighting Corp., 821 F.2d 1253 (6th Cir. 1987)(holding that the re-bricking of a glass melting furnace was part of the routine maintenance necessary for the overall manufacturing operations at a glass making factory); Thompson v. The Budd Co., 199 F.3d 799 (6th Cir. 1999)(holding that the maintenance of heating, ventilation, and cooling system at an automobile parts stamping facility was regular and recurrent part of business). In each case, the court held that the construction work or routine maintenance and repair work constituted work of a kind which is a regular or recurrent part of the hiring company's business, and therefore, the hiring company was deemed a contractor pursuant to KRS 342.610(2)(b). In the present case, Wal-Mart neither contracted with Bluegrass Cellular to conduct any construction work or routine maintenance or repair work. While establishing the general principals of Kentucky law on this issue, these cases unfortunately are of limited assistance in determining whether Wal-Mart qualifies as a contractor pursuant to KRS 342.610(2)(b) under the facts of this case.

Kentucky courts have not had the occasion to address a case factually similar to the present case. However, several courts in other jurisdictions have addressed similar issues under similar workers' compensation statutes. See Corollo v. S. S. Kresge Co., 456 F.2d

306 (4th Cir.), cert. denied, 407 U.S. 911 (1972)(millinery and handbag department); Carmody v. F.W. Woolworth Co., 361 S.E.2d 128, 130 (Va. 1987)(portrait photography business); Schmolke v. Krauss Co., 217 So. 2d 789 (La. App.1969)(shoe department); Tindall v. Denholm & McKay Co., 196 N.E.2d 631 (Mass. 1964)(millinery department). A review of the facts of these cases, which the parties have discussed at length, are instructional and helpful in determining whether Wal-Mart is deemed a contractor pursuant to KRS 342.610(2)(b).

In Corollo v. S. S. Kresge Co., 456 F.2d 306, 307 (4th Cir. 1972), an employee of Benjamin Kraft and Sons, Inc., ("Kraft") was injured when she fell on a wet floor in the K-Mart store in which she was working. At the time of her injury, K-Mart had entered into a license agreement with Kraft for the operation of a department for the sale of millinery and handbags. Pursuant to the terms of the license agreement, Kraft employees wore badges that identified them as K-Mart employees; all Kraft's sales were conducted in the name of K-Mart; payment for any goods purchased in the millinery department was made at the K-Mart checkout counter and K-Mart retained control over credit charges; K-Mart supplied all fixtures, utilities, janitorial services, and security; K-Mart had exclusive control of all advertising; and Kraft paid K-Mart a percentage of Kraft's gross sales as the license fee. Furthermore, the millinery department was not separated by "a partition or otherwise" from the other departments. Based on these facts, the Fourth Circuit Court of Appeals held that the sale of millinery was a part of the trade, business or occupation of K-Mart and the exclusive remedy of Kraft's injured employee was under the state's workers' compensation

act. Id. at 312.

Similarly, in Carmody v. F.W. Woolworth Co., 361 S.E.2d 128, 130 (Va. 1987), an employee of Photo Corporation of America ("PCA") was injured in the Woolco Department Store. At the time of the employee's injury, Defendant Woolworth operated discount department stores including Woolco and had entered into a license agreement with PCA for the taking and sale of photographs. Under the terms of the agreement, PCA was required to give ten percent of its sales to Woolworth; PCA employees were required to wear Woolworth badges or uniforms; Woolworth furnished any fixtures, signs, and equipment including cash registers PCA needed; and Woolworth reserved authority over sales, refunds, exchanges, and extensions of credit. Id. The license agreement provided that all advertising and promotion was to be conducted under the exclusive supervision, management, and control of Woolworth. Additionally, PCA was not permitted to display its name anywhere in the stores except on its brand name merchandise. Furthermore, employees could only receive checks from customers drawn or endorsed to "F.W. Woolworth Co." or "Woolco Department Stores." Id. Relying upon Corollo, the Virginia Supreme Court held that PCA's patent photography business represented merely an extension of the owner's retail sales business, and therefore, PCA's employee was Woolworth's statutory employee at the time of the injury and his tort claim was barred by the state's workers' compensation act. Id at 133.

In Schmolke v. Krauss Co., 217 So.2d 789 (La. App. 1969), an employee of Sid Katz, Inc., ("Katz") was injured on the premises of a department store owned by Krauss Company ("Krauss"). At the time of the employee's injury, Krauss had entered into a "lease and

11

agreement" with Katz for the operation of the shoe department within the department store. Pursuant to the terms of the agreement, Katz was required to pay a percentage of gross sales to Krauss, or a "minimum annual rental" if the specified percentage of gross sales fell below the minimum. Significantly, the agreement provided that the space was to be used exclusively as a shoe department "and as part of the general business of Lessor, and conducted under the trade name of Lessor." In reviewing the agreement, the Louisiana Court of Appeals observed that the requirement of Katz's operation of the shoe department as a department of Krauss' store was adhered to consistently throughout the agreement. The court held that Krauss undertook the operation of a shoe department, contracted with Katz for the execution by Katz of that operation, and as a result, a principal and contractor relationship was established between Krauss and Katz. The court further held that a shoe department is a part of the business of a department store, and the injured employee's exclusive remedy was workers' compensation.

Wal-Mart argues that the cases discussed above support summary judgment in its favor. Wal-Mart contends that these cases involve statutes very similar to KRS 342.610(2) and consistently hold that a department store which hires an independent contractor to operate a department within the retail store is the statutory employer of the independent contractor's employees.

While the Court agrees with the Defendant that these cases are the most closely analogous cases to the issue presented in this matter, the Court disagrees with the Defendant that the holdings of these cases warrant a grant of summary judgment in its favor. Each case

12

demonstrates common factors which are not present in the case at hand. For example, in each of these cases, the agreement between the department store and the independent contractor required the independent contractor's employees to maintain an appearance of employment by the department store by wearing the store's uniform or badge, the department was not separated by partition or otherwise from the other departments in the store, the goods were sold under the name of the department store, the department store had complete control over the advertising, sales, refunds and exchanges, and the department store retained a percentage of the gross sales or profit of the independent contractor or licensee. In effect, the license or lease agreement in each case created the appearance of a single-integrated business or enterprise. See Corolla, 456 F.2d at 312 ("[T]he whole public conduct of the business was in the name of" the department store. Id.)

In contrast, none of these determinative factors are present in the instant case. Under the March 1, 2002 License Agreement, a clear distinction existed between Bluegrass Cellular's business and Wal-Mart's business. The License Agreement reflects that Bluegrass Cellular leased or rented a twenty-four (24) square foot kiosk from Wal-Mart for a fixed monthly fee of $2,200.00 in order to conduct Bluegrass Cellular's business. The Agreement contained no partnership or revenue sharing and Wal-Mart received no percentage of Bluegrass Cellular's sales. Pursuant to the Agreement, Bluegrass Cellular operated the kiosk with its own independent inventory, cash handling procedures, and employees; retained complete control over its sales, refunds, exchanges, and credit procedures; maintained the kiosk at Bluegrass Cellular's cost and expense; and installed and

maintained its own phone lines. The cellular phones and services were sold under the name of Bluegrass Cellular. In fact, Bluegrass Cellular was not permitted to operate its business in Wal-Mart's name or even reference the name of Wal-Mart without the written consent of Wal-Mart. Additionally, the Agreement clearly stated that "[n]o provisions of this Agreement shall vest in Wal-Mart any control in any . . . facility or operation of Carrier." (License Agreement at § 9.03). Bluegrass Cellular employees were required to wear their own uniforms or name tags, were not permitted to represent themselves as Wal-Mart employees, and were unable to utilize the Wal-Mart employee's break areas, lounges or restroom facilities. Furthermore, Bluegrass Cellular conducted its business in a kiosk that contained a large Bluegrass Cellular logo clearly separating Bluegrass Cellular's business from Wal-Mart's operations.

Unlike the cases discussed above and relied upon by the Defendants, Bluegrass Cellular acted as a distinct business entity as evidenced by the terms of its agreement with Wal-Mart and by its conduct during the contract period. Significantly, the "whole public conduct" of the cellular business was in the name of Bluegrass Cellular, as opposed to Wal-Mart. The License Agreement, along with the affidavits, clearly indicate the relationship between Bluegrass Cellular and Wal-Mart was that of a landlord/tenant, instead of contractor/subcontractor. Wal-Mart did not undertake the operations of a cellular phone department in the old Leitchfield Wal-Mart store. Wal-Mart did not contract with Bluegrass Cellular to sell cellular phones and services for Wal-Mart or to run Wal-Mart's cellular phone department. Wal-Mart merely rented or leased a kiosk to Bluegrass Cellular for the

purpose of Bluegrass Cellular conducting its own cellular phone business. For these reasons, the Court concludes that Wal-Mart does not qualify as Smith's statutory employer and is not immune from tort liability.

## IV. CONCLUSION

For the reasons set forth above, the Defendant's motion for summary judgment [DN 8] is **denied**.

cc: counsel of record